**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| RICKIE S. FELDT,       ) | |
|           ) | |
|      **Plaintiff,**      ) | |
|           ) | |
|     v.         ) | **CIVIL NO. 4:08-CV-24-AS-APR** |
|           ) | |
| MICHAEL J. ASTRUE,    ) | |
| COMMISSIONER OF SOCIAL   ) | |
| SECURITY,           ) | |
|           ) | |
|      **Defendant.**     ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rickie S. Feldt ("Ms. Feldt"), seeks judicial review of the denial of benefits under Title XVI of the Social Security Act. The Commissioner of Social Security found that Ms. Feldt was not disabled because she could perform a significant number of jobs in the national economy, and thus, not entitled to Supplemental Security Income ("SSI") under 42 U.S.C. § 1382c.

Ms. Feldt applied for SSI on May 7, 2004, claiming a disability onset date of March 7, 2001, due to panic attacks, depression, and back pain. (Tr. 52, 93). Ms. Feldt's initial claim and request for reconsideration were denied. (Tr. 38, 42). A hearing was held before an Administrative Law Judge, which was conducted by Albert Velasquez ("the ALJ") on August 7, 2007.[1] (Tr. 434-57). The ALJ issued an opinion dated October 2, 2007, denying her application for SSI. (Tr. 13-25). Ms. Feldt filed a request for review, which was denied by the Appeals Council, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-7). Ms. Feldt filed her complaint on April

---

[1]     The Court takes judicial notice of the August 7, 2007 administrative hearing in which Ms. Feldt testified in the presence of counsel. (Tr. 434-57). The hearing also included testimony from vocational expert Gail Corn, a Certified Rehabilitation Counselor. (Tr. 13, 452-55).

11, 2008, contending that the decision by ALJ Velasquez is not supported by substantial evidence and is contrary to law. Jurisdiction is conferred upon this Court pursuant to § 1383(c)(3), and oral argument was held on March 20, 2009, in South Bend, Indiana.

## I. FACTUAL BACKGROUND

Ms. Feldt was born on January 1, 1975, is currently thirty-four years old and was thirty-two years old when the ALJ issued his decision. (Tr. 25, 52). She completed the ninth grade and, prior to her disability, worked as a groundskeeper, housekeeper, production worker, and restaurant cashier. (Tr. 93-94, 97).

Ms. Feldt has been treated by numerous physicians and clinicians since 2002. Their findings, reports, and opinions are summarized below by year, indicating the treating individual or entity. Additional documentation regarding her employment and family life are also noted.

Medical Evidence

2002

On April 19, 2002, Dr. Sutton saw Ms. Feldt and diagnosed her with anxiety and stress. He also noted that she was a smoker with a history of asthma. (Tr. 260).

2003

Days Inn, a former employer, reported that Ms. Feldt worked from August 29 to October 4, 2003 as a housekeeper. (Tr. 73). She was reportedly unreliable, "calling off" several times and was given a written warning. (Tr. 73). Days Inn also indicated that Ms. Feldt would not be rehired because she was a "no call/no show." (Tr. 75).

In November 2003, Wabash Valley Hospital ("WVH") diagnosed Ms. Feldt with major depressive disorder (single episode) and generalized anxiety disorder. (Tr. 121, 171, 245). Her

Global Assessment of Functioning ("GAF") was reported as 60/60. (Tr. 121, 171, 245). A doctor documented that her activities of daily living were unlimited. (Tr. 121, 171, 245).

2004

On February 9, 2004, WVH records show that Ms. Feldt's psychiatric medications were very sedating and rendered her rather nonfunctional. Ms. Feldt felt "over-medicated" and had been unable to function since beginning the medication on February 2, 2004. (Tr. 204-205). Further, it was noted that Ms. Feldt had been struggling with her depression and agitation for a long time, and was finally addressing it in an appropriate fashion. (Tr. 205). One of her doctors, Dr. Pickering, noted that he did not believe that Ms. Feldt was capable of the routine expected to fulfill the requirements of the individual therapy program. (Tr. 205).

In June 2004, Dr. Hartig examined Ms. Feldt, who complained of right ankle pain after inverting her right ankle on a step. (Tr. 412). Dr. Hartig reported no hand or upper extremity abnormalities, yet there is no indication that her hands or upper extremities were examined. (Tr. 413).

On June 10, 2004, Ms. Feldt reported to the Disability Determination Bureau that she cooked, did the laundry, and cleaned the house "on a daily or weekly basis." (Tr. 80). She stated that she had some difficulty doing laundry and cleaning the house due to "lower back problems." (Tr. 80). The Disability Determination Bureau also requested that Ms. Feldt's mother complete a questionnaire regarding the functionality of her daughter. Ms. Feldt's mother reported that Ms. Feldt did household duties, and cared for herself and her children from the time she woke up until bedtime. (Tr. 83). Her mother also reported that, while Ms. Feldt is unable to maintain a daily routine and has trouble sleeping, she has no problem with her personal care, cooking her own meals, and doing daily

household chores including cleaning, laundry, household repairs, and ironing. (Tr. 84, 85). In addition, Ms. Feldt went shopping for food and clothing, and was able to pay bills, count change, and use a checkbook or money order. (Tr. 86). Further, Ms. Feldt's mother indicated that Mr. Feldt's impairments did not affect her ability to use her hands. (Tr. 88). Her mother noted that when Ms. Feldt cannot or does not do activities, it is because Ms. Feldt is depressed or distracted. (Tr. 85).

On July 13, 2004, Dr. Newton saw Ms. Feldt for a medical consultative examination. (Tr. 249-252). The physical examination revealed that Ms. Feldt had a normal range of wrist motion, normal (5/5) grip strength, normal fine finger movements, and normal ability to handle small objects and buttons. (Tr. 251). Yet, Ms. Feldt was unable to walk on her heels or toes, unable to squat, and unable to bend all the way over and get back up without difficulty. (Tr. 250). Additionally, there was tenderness to palpitation of the spine. (Tr. 250). In the joints that were tested, there was no evidence of inflammation, effusion, or swelling, and her straight-leg raising was positive. (Tr. 250). Her range of motion of the lumbar spine was reduced in all planes. (Tr. 252). Dr. Newton's assessment revealed that Ms. Feldt had degenerative disease of the lumbar spine, depression, anxiety, and that she abused tobacco. (Tr. 251). Dr. Newton also reported that Ms. Feldt needed further evaluation of her lumbar spine, a mental status exam, and should participate in a smoking cessation program. (Tr. 251).

On September 2, 2004, Dr. Buonanno saw Ms. Feldt for a psychiatric consultative examination. (Tr. 241-242). Ms. Feldt told Dr. Buonanno that she bathed, groomed, and dressed without assistance. (Tr. 242). She also stated that she cooked, cleaned, did laundry, watched television, read, and occasionally went grocery shopping. (Tr. 242). He gave a diagnosis of panic disorder with agoraphobia; major depression (recurrent, moderate); and learning disorder, NOS; and

mathematics disorder. (Tr. 242).  He also noted lower back problems, panic attacks, and unstable moods. (Tr. 242).  He judged that Ms. Feldt could not manage her own funds, and gave her a GAF score of 49. (Tr. 242).

On September 15, 2004, Ms. Feldt's fiancé, Steve, reported that he and Ms. Feldt went out to eat, and to the mall and movies together. (Tr. 77).  He also stated that Ms. Feldt came over to his home with her children, and that he and Ms. Feldt spent time together while their children played. (Tr. 77).  In addition, Steve stated that Ms. Feldt cooked, took care of her daughters (ages four and seven), and cleaned up after them. (Tr. 77).  Further, he stated that Ms. Feldt had friends, got along "fine" with waiters and store personnel, had "no problems" getting along with others, and could handle her finances "on her own."

On October 4, 2004, B.R. Horton, Psy.D., reviewed the record and opined that Ms .Feldt had only a "mild" restriction of daily activities. (Tr. 224, 234).  The next month, Ms. Feldt was depressed and a social worker reported that, within the past thirty days, Ms. Feldt had difficulty getting out of bed, caring for her children, starting household tasks, and completing daily living activities. (Tr. 148-151, 179).

<u>2005</u>

On January 11, 2005, Ms. Feldt saw Dr. Ramos for pain management. (Tr. 128).  He found weakness of her right lower extremity, but no sensory deficits.  His diagnosis was low back pain with lumbar radiculopathy. (Tr. 129).  He prescribed Lortab every 6 hours as needed for pain. (Tr. 129).

On February 5, 2005, Dr. Ramos gave a lumbar epidural steroid injection at the L4-5. (Tr. 307).  On February 23, 2005, Ms. Feldt was treated by Judy Louden, CNS, a nurse practitioner at WVH.  She diagnosed Ms. Feldt with major depression (recurrent, moderate) and generalized

anxiety disorder. (Tr. 116).   Further, from February 24 to February 26, 2005, Ms. Feldt was hospitalized.  After fighting with her fiancé and being acutely intoxicated, Ms. Feldt  made some deep cuts on her right arm, requiring surgery. (Tr. 116).  It was noted that she cut herself "more deeply than what she intended." (Tr. 116).  The surgery report is not in the file, but it is described by Dr. Ramachandran, as a repair of the right palmaris longue median nerve, flexor digitorum superficialis to the lone, flexor digitorum superficialis to the ring, flexor digitorum profundus to the small, and flexor cari ulnaris, ulnar nerve and ulnar artery. (Tr. 338).

On March 10, 2005, Ms. Feldt saw Dr. Ramachandran for a two-week post-surgical check-up. (Tr. 356).  An exam revealed good capillary refill, no sign of infection or drainage, but she still had no sensation in the small finger.  (Tr. 356).  Dr. Ramachandran removed the sutures, gave Ms. Feldt a splint to wear, and recommended rehabilitation and therapy. (Tr. 356).

On March 22, 2005, Dr. Ramos saw Ms. Feldt and diagnosed her with low back pain and lumber radiculopathy. (Tr. 306).  On March 29, 2005, Ms. Feldt saw Dr. Ramachandran the day after she fell down some stairs. (Tr. 354).  An exam revealed some tenderness over the right distal ulnar region and decreased sensation in her right pinky and ring fingers, but normal sensation in her other fingers and thumb.  (Tr. 354).  X-rays of the right wrist revealed no fracture. (Tr. 354).  Dr. Ramachandran concluded that Ms. Feldt was "doing very well" and that her sensation had improved considerably since her last check-up. (Tr. 354).

On April 4, 2005, Ms. Feldt had an MRI on her lumbar spine.  The MRI showed moderately large broad-based disc protrusion at the L-5-S1 disc, which extends close to the S1 nerve arthropathy, but did not appear to contact either one; smaller disc protrusion at L4-5, which could be associated with a small annular tear; but only mild narrowing of the spinal canal with no nerve

root compression apparent. (Tr. 288).

At her six-week post-surgical check-up on April 7, 2005, Ms. Feldt complained of numbness in her right pinky finger, and Dr. Ramachandran noted that Ms. Feldt had a burn on her pinky finger. (Tr. 353). An exam revealed decreased sensation, but no sign of infection. (Tr. 353).

At her ten-week post-surgical check-up on May 5, 2005, Dr. Ramachandran reported that Ms. Feldt's exam revealed well-healed wounds with no sign of infection. (Tr. 352). Ms. Feldt had clawing[2] of the right pinky and ring fingers, sensory loss in the ulnar distribution, and no strength (0/5) in the phalangeal abduction, but normal (5/5) strength in thumb abduction, thumb extension, index to thumb pinch, and wrist extension.

On June 9, 2005, Dr. Ramachandran saw Ms. Feldt for a follow-up after her surgery. (Tr. 351). He reported that Ms. Feldt had unfortunately sustained several burns on her small finger, because of lack of sensation in her small finger. (Tr. 351). He also stated that Ms. Feldt would need to be very cautious about burning herself, like she did while using hot instruments. (Tr. 351). Ms. Feldt reported that she was "doing very well" and had already recovered "a significant amount of function." An exam revealed decreased sensation in the right pinky and ring fingers, and no strength (0/5) in the finger abduction, but Ms. Feldt could flex her fingers against resistance, had "intact" median nerve function, and had normal (5/5) strength in thumb abduction, thumb extension, index to thumb pinch, and wrist extension. (Tr. 351). Dr. Ramachandran stated that Ms. Feldt had done "an excellent job of rehabbing herself," but would require "further rehab." (Tr. 351). He recommended a "home program" but opined that Ms. Feldt was "very functional." (Tr. 351).

---

[2]    The term "clawing" describes the position of two fingers bent down and in toward the palm.

On June 13, 2005, Dr. Crececlius saw Ms. Feldt. (Tr. 349). His assessment revealed axial back pain with two level degenerative disease. (Tr. 349). He did not feel a surgical option would help. (Tr. 349). An X-ray revealed mild lower lumbar spondylosis. (Tr. 350). Also on June 13, 2005, Dr. U. Kalapatapu saw Ms. Feldt for a psychiatric evaluation. She was diagnosed with major depression (recurrent episode, severe without mention of psychotic behavior); posttraumatic stress disorder; anxiety disorder (generalized); and attention deficit disorder (inattentive with hyperactivity). (Tr. 378). Her GAF score was 50. (Tr. 378).

On July 15, 2005, Ms. Feldt went to the Emergency Room for back pain. (Tr. 410). She was diagnosed with acute exacerbation of chronic low back pain. (Tr. 411). She was given IM Morphine, which gave some relief. (Tr. 411). On July 19, 2005, Dr. Ramos saw Ms. Feldt and diagnosed her with L5-SI broad-based disk protrusion; L4-L5 disk protrusion; and Lumbar radiculopathy. (Tr. 305).

On August 2, 2005, Dr. Ramos saw Ms. Feldt, and diagnosed her with L5-S1 broad-based disk protrusion; L4-L5 disk protrusion; and Lumbar radiculopathy, resolved. (Tr. 304). A note on August 4, 2005, indicated that Dr. Ramos gave Ms. Feldt Lortab and Duragesic, but a urinalysis was negative for both. (Tr. 279). Dr. Ramos discharged Ms. Feldt. (Tr. 279).

At her 24-week post-operative check-up, in August of 2005, Ms. Feldt told Dr. Ramachandran that sensation was returning to her hand, especially in the ulnar nerve distribution, and that she had exquisite hand tenderness. (Tr. 341). She also complained of a "mass" in her wrist which caused problems with wrist motion, and she asked Dr. Ramachandran to remove the mass. (Tr. 341). An exam revealed decreased sensation in Ms. Feldt's right pinky and ring fingers, clawing of the pinky and ring fingers, and decreased (3/5) finger abduction, but normal (5/5) thumb abduction, thumb extension, index to thumb pinch, and wrist extension. (Tr. 341). The exam also

revealed that the mass on the back side of her right wrist was "minimally tender." (Tr. 341-342). Dr. Ramachandran diagnosed a right wrist dorsal ganglion cyst and recommended that it be removed. (Tr. 342).

On August 30, 2005, Ms. Feldt was seen at the Community Health Clinic and was diagnosed with back pain. (Tr. 276). She refused a urine drug screen and the examiner informed Ms. Feldt that he would not give her a controlled substance. (Tr. 276). This same day, Dr. Charabati saw Ms. Feldt for back pain. (Tr. 301). He noted that she was discharged from Dr. Ramos' office due to the fact that her drug screen revealed no pain medications or controlled substances in her urine. (Tr. 302). He also noted that he saw Ms. Feldt one week prior for sore throat and ear pain. At that time, she did not complain of any back pain and Dr. Charabati described Ms. Feldt as "ambulating freely with no problems." (Tr. 301). At the current appointment, Ms. Feldt denied that she had any pain in her extremities. (Tr. 302). Additionally, she denied nervousness, irritability, memory loss, problems, depression, unusual fears, trouble getting to sleep, nightmares, and sexual disturbances. Further, it was noted that Ms. Feldt did not oversleep on a regular basis. (Tr. 302).

On September 7, 2005, Dr. Ramachandran excised the right wrist dorsal ganglion cyst. (Tr. 293).

In October 2005, an exam by Dr. Sloan revealed normal (5/5) strength in Ms. Feldt's upper extremities. (Tr. 409). He diagnosed her with headaches and anxiety, and noted a problem with domestic violence. (Tr. 409). He gave her two Vicodin and instructed her to follow up with her regular doctor. (Tr. 409).

On November 17, 2005, Dr. Greenwald, a pain management specialist, performed a physical examination of Ms. Feldt, and his diagnosis was lumbar spondylosis and degenerative disk disease.

(Tr. 340). He did not report any hand or arm-related abnormalities. (Tr. 339-340). Dr. Greenwald offered physical therapy but did not feel comfortable assuming responsibility in providing her with controlled substances or narcotic analgesics. (Tr. 340). He made this determination based upon physically examining Ms. Feldt and his review of her previous records and diagnostic reports, including records from her previous pain clinic. (Tr. 340). He also reported that Ms. Feldt was currently "physically active" but did not work. (Tr. 339). The next day, Ms. Feldt went to the Emergency Room because she cut her wrist with a piece of broken glass during an argument with her boyfriend. (Tr. 405). An exam revealed "very superficial scratches" on the right wrist, but these scratches did not require stitches or penetrate her dermis. (Tr. 405). Ms. Feldt remained intact from a neurological and vascular standpoint. (Tr. 406).

On December 8, 2005, Dr. Ramachandran saw Ms. Feldt for a ten month post-op follow-up. (Tr. 338). The examination showed decreased sensation in Ms. Feldt's right pinky and ring fingers, some flexion in her distal interphalangeal ("DIP") and proximal interphalangeal ("PIP") joints[3], and her pinky finger could be passively extended. (Tr. 338). She had 3/5 strength in her finger abduction, but normal 5/5 strength in thumb abduction, thumb extension, index to thumb pinch, and wrist extension. (Tr. 338). She no longer had any clawing of the fingers. (Tr. 338). Dr. Ramachandran reported that Ms. Feldt's surgical wounds were "well-healed" and she was "doing extremely well." (Tr. 338). He recommended that Ms. Feldt wear a splint, continue to work on her range of motion in her small digit, and exercise her hand daily, reminding her that exercising her hand daily was imperative for her to improve her function. (Tr. 338). He noted that she had done this so far in

---

[3]     The DIP joint is located near the end of every finger, excluding the thumb. The PIP joint is the middle joint between the main knuckle and the DIP joint.

excellent fashion. (Tr. 338). In addition, he noted that he would see Ms. Feldt as needed in the future. (Tr. 338).

On December 16, 2005, Dr. Greenwald saw Ms. Feldt and ordered continued physical therapy for lumbar spondylosis and degenerative disk disease. (Tr. 336). He also planned a medial branch block. (Tr. 336).

Again, on December 20, 2005, Dr. Greenwald saw Ms. Feldt. (Tr. 331). A pervious MRI showed a large broad based disk protrusion at L5-S1, extending close to the S1 nerve root but not contacting the nerve, and a small disk protrusion L4-5 possibly associated with an annular tear. (Tr. 331). The diagnosis revealed lumbar spondylosis and degenerative disk disease. (Tr. 331). Dr. Greenwald did a procedure, right-sided L3, L4, and L5 medial branch facet nerve block for diagnostic therapeutic purposes. (Tr. 333).

On December 27, 2005, Ms. Feldt went to the Emergency Room for vomiting and diarrhea. (Tr. 426).

2006

On January 16, 2006, Ms. Feldt was seen at Southside Urgent Care for cervical strain and occipital scalp contusion after she had fallen down four steps. (Tr. 328). She was prescribed Daypro and Norflex. An X-ray of the cervical spine showed no acute osseous injury. (Tr. 328). On January 25 and 27, 2006, Dr. Greenwald evaluated Ms. Feldt and diagnosed her with degenerative disc disease, myofascial pain, and a history of major depression. (Tr. 322). He again told Ms. Feldt that he was not comfortable assuming responsibility for providing her with controlled substances or narcotic pain medications for the following reasons: (1) Her discharge from another pain physician for violation of a controlled substance agreement, (2) Despite being on narcotic pain medications

from the other pain physician, it was still necessary for her to go to the hospital for uncontrolled pain, (3) Her psychiatric history of severe depression, and (4) The incident where she cut her wrist, with a potential suicide attempt. Even more concerning was the fact that she had been on both pain medications, which she was mixing with alcohol. (Tr. 322). Dr. Greenwald's plan was to treat Ms. Feldt with physical therapy, rheumatology consult, an EMG and consult with neurology, and a Liboderm patch. (Tr. 322). His exam also revealed that Ms. Feldt had 4/5 grip strength on January 25, and on January 27, the physical exam did not report any hand, wrist, or arm abnormalities. (Tr. 321-322).

On February 1, 2006, Dr. Lockwood saw Ms. Feldt and found that she had features of fibromyalgia; however, she did not meet the case definition, because she only had 10, not 11 of the 18 tender points. (Tr. 317-318, 320). Dr. Lockwood recommended that treatment should be the same as if she had fibromyalgia. (Tr. 317-318, 320). He gave a diagnosis of myalgia and myositis unspecified. (Tr. 317, 318, 320).

On February 12, 2006, Ms. Feldt was seen in the Emergency Room after being assaulted by another inmate at the county jail. (Tr. 422). A CT scan of her head showed no acute intra cranial abnormality. (Tr. 289). Her left shoulder X-ray was negative. (Tr. 290). An X-ray of her lumbar spine was within normal limits. (Tr. 291). Dr. Altuglu reported that Ms. Feldt had some ecchymosis on her left shoulder and extremities, but a full range of upper extremity motion. (Tr. 417). No abnormal hand findings were reported. (Tr. 417).

<u>2007</u>

In February 2007, Ms. Feldt was examined by Dr. Howard Izenson. (Tr. 396). Ms. Feldt complained of achiness, fatigue, right ear pain, sore throat, and cough. (Tr. 396). No hand or arm

abnormalities were noted, however there is no indication that they were examined. (Tr. 396-397).

Hearing Testimony

At the administrative hearing on August 7, 2007, Ms. Feldt testified that her right pinky finger was clawed, that she had decreased sensation in her right pinky and ring fingers, and that she could not touch her fingertips to the palm of her right hand. (Tr. 443-444). She also stated that she had pain in her pinky that radiated to her wrist. (Tr. 444). In addition, she stated that she could hold items tightly with her thumb and first two fingers, but not with her pinky and ring fingers. (Tr. 444). When she tried holding onto things with her right hand, she dropped them. (Tr. 444). Ms. Feldt testified that she is left-handed, and therefore the injury was to her right, non-dominant hand. (Tr. 448).

Gail Corn, the vocational expert, also testified at the administrative hearing. She was asked to assume the existence of a hypothetical individual, of Ms. Feldt's age, who had Ms. Feldt's education and work experience. (Tr. 452). In doing so, this person, who had the limitations identified in the ALJ's residual functional capacity ("RFC") finding, including restrictions against repetitive forceful gripping and operating vibrating tools with the right hand, could perform at least 16,000 light jobs in the State of Ohio, including work as an assembler, hand packager and inspector, and 4,100 sedentary jobs in the State of Ohio, such as an assembler, machine operator, inspector, and hand packager. (Tr. 453).

ALJ's Decision

ALJ Velasquez made several findings, summarized as follows: (1) Ms. Feldt had not engaged in substantial gainful activity since April 23, 2004; (2) She had a combination of impairments including degenerative disc disease of the spine, fibromyalgia, status post right ulnar

nerve repair, depression, bipolar disorder, generalized anxiety disorder, and alcohol abuse in partial

remission; (3) She had no impairment or combination of impairments that met or medically equaled

one of the listed impairments; (4) She had the RFC to perform a range of light work defined as

lifting, carrying, pushing/pulling ten pounds frequently and twenty pounds occasionally, sitting,

walking, and standing for a total of six hours during an eight hour work day, provided she had the

opportunity to alternate positions for one to two minutes every hour at the work station, but could

not climb ladders, ropes or scaffolds, kneel, crouch, or crawl, and could  occasionally climb stairs

and ramps, balance and stoop, but could never work at unprotected heights, around dangerous

moving machinery, open flames, or large bodies of water and could not operate a motor vehicle, but

could perform simple, routine, repetitive tasks that require no repetitive forceful gripping or

operation of vibrating tools with her nondominant right hand, and could not have more than

superficial interaction with the general public, co-workers, and supervisors, and she could not

perform work requiring mathematics beyond simple addition and subtraction; and based on the RFC,

she had no past relevant work; and (5) Considering her age, education, work experience, and RFC,

there were jobs that existed in significant numbers in the national economy that Ms. Feldt could

perform, and she was not disabled for purposes of the Act.  (Tr. 15, 17).

## II.  STANDARD OF REVIEW

This Court's review of the Commissioner's decision is a limited one.  Unless there is an error

of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial

evidence.  *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001).  Substantial evidence consists of

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In making a substantial evidence determination,

the court will review the record as a whole, but will not reconsider the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *William v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Thus, if reasonable minds could disagree on whether an individual is disabled, the court must affirm the Commissioner's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996). However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

### III. DISCUSSION

Generally, "[b]enefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir. 1976) (citing *Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971)). Furthermore, the claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C.

§ 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

The regulations supporting the Social Security Act create a five-step inquiry in determining whether a claimant is disabled, under which the ALJ must consider the applicant's claim in the following sequence:

(1)    Whether the claimant is currently employed;
(2)    Whether the claimant has a severe impairment;
(3)    Whether the claimant's impairment meets or equals one listed by the Secretary;
(4)    Whether the claimant can perform her past work; and
(5)    Whether the claimant is capable of performing any work in the national economy.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R § 404.1520). The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Bolinger v. Barnhart*, 446 F.Supp.2d 950, 955 (N.D. Ind. 2006).

In this case, the ALJ conducted the five-step inquiry, and Ms. Feldt takes exception to the finding that she retained an RFC to perform a range of light work with the limitations detailed above. Specifically, Ms. Feldt alleges that the ALJ erred in assessing her RFC because it did not adequately account for Ms. Feldt's lack of sensation and lack of grip in her non-dominant hand, and because the ALJ found that Ms. Feldt had no limitations in her activities of daily living, when in fact she claims that she cannot sustain activities eight hours a day, five days a week, in light of her mental limitations. Ms. Feldt requests that the Court reverse the decision of the ALJ because it is not supported by substantial evidence and is contrary to law.

**Residual Functional Capacity**

The RFC is an assessment of what work-related activities the claimant can perform despite her limitations. 20 C.F.R. § 404.1545(a); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

The RFC must be assessed based on the relevant evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling. S.S.R. 96-8p; *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003). The RFC assessment must include a narrative discussion which describes how the objective and subjective evidence supports each of the ALJ's conclusions, and explain how the material inconsistences or ambiguities in the evidence were resolved. S.S.R. 98-8p; *Zblewski v. Astrue*, 302 Fed. Appx. 488, 492-93 (7th Cir. 2008). The RFC determination is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2).

While all limitations are considered in assessing the RFC,[4] the Court addresses Ms. Feldt's RFC arguments specifically regarding her non-dominant hand and emotional limitations.

### 1) RFC and Limitations of the Non-Dominant Hand

The ALJ determined that Ms. Feldt could perform a range of light work, including lifting, carrying, pushing and pulling ten pounds frequently and twenty pounds occasionally; sitting, walking, and standing for a total of six hours each, during an eight-hour work day, provided that she has the opportunity to alternate positions for one to two minutes every hour at the work station. The ALJ included the following restrictions on Ms. Feldt's ability to perform the above-described light work: no climbing ladders, ropes or scaffolds, kneeling, couching or crawling; only occasional

---

[4]     The ALJ noted that in determining the claimant's RFC, he "must consider all of the claimant's impairments, including impairments that are not severe." (Tr. 14). The ALJ considered Ms. Feldt's degenerative disc disease of the lumbar spine, fibromyalgia, status post right ulnar nerve repair, and her mental impairments (depression, bipolar disorder, generalized anxiety disorder, learning disability, post traumatic stress disorder and alcohol abuse in partial remission).

climbing of stairs, ramps, balance and stoop; no working at unprotected heights, around dangerous

moving machinery, open flames, or large bodies of water; no operation of motor vehicles; able to

do simple, repetitive tasks but no repetitive forceful gripping or operation of vibrating tools with her

non-dominant right hand, no more than superficial interaction with the general public, co-workers,

and supervisors, and no work requiring mathematics beyond simple addition and subtraction.

Ms. Feldt argues that this determination fails to account for the evidence in the record

regarding her lack of sensation and some lack of grip in her right, non-dominant hand.

In assessing Ms. Feldt's physical abilities, the ALJ must:

> . . .first assess the nature and extent of [the claimant's] physical
> limitations and then determine [the claimant's] residual functional
> capacity for work activity on a regular and continuing basis. A limited
> ability to perform certain physical demands of work activity, such as
> sitting, standing, walking, lifting, carrying, pushing, pulling, or other
> physical functions (including manipulative or postural functions, such
> as reaching, handling, stooping or crouching), may reduce [the
> claimant's] ability to do past work and other work.

20 C.F.R. § 404.1545(b).

The ALJ evaluated Ms. Feldt's symptoms by first considering whether any underlying

medically determinable physical/mental impairment could reasonably be expected to produce the

claimant's pain/symptoms, and then by, determining the intensity, persistence, and limiting effects

of the symptoms. The ALJ specifically stated that he considered the objective medical evidence,

along with the factors listed in 20 C.F.R. § 416.929(c), in finding that Ms. Feldt's statements

concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.

*See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (finding that a credibility determination will

stand as long as there was some support in the record, even if some of the ALJ's credibility

determinations were a bit harsh). Despite Ms. Feldt's complaints of constant and sharp low back pain, the ALJ noted that she remained physically active but did not work, and yet continued to hike, shop, go to the movies, go out to eat, and visit family and friends and play games. *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (indicating that it is proper for an ALJ to consider a claimant's daily activities as a factor when assessing the credibility of a claimant's complaints).

Specifically concerning her non-dominant hand, the ALJ noted that Ms. Feldt underwent multiple flexor tendon repair, including the ulnar nerve and ulnar artery on February 24, 2005, and thereafter, the treatment records indicated that she had sensation in her hand, her strength was 5/5 for thumb abduction and extension, 3/5 for phalangeal abduction, and 5/5 for index to thumb pinch and wrist extension, with some limited range of motion at the wrist. Then, after removal of a dorsal ganglion cyst from her right wrist, her wrist function improved and she was released for follow-up as needed. On November 18, 2005, Ms. Feldt cut her right wrist after an argument, but the cuts were superficial, did not penetrate the dermis, and did not require sutures.

Ms. Feldt's medical history shows that she had some mild finger/grip weakness, and decreased sensation in her small and ring finger. The ALJ agreed, and found that Ms. Feldt had some sensation in her hand and took note of Ms. Feldt's grip strength and limited range of motion of her wrist. Contrary to Ms. Feldt's contention, the ALJ explicitly accounted for the impairment of her non-dominant hand by limiting the range of light work that Ms. Feldt could perform, stating that Ms. Feldt "could perform simple, routine, repetitive tasks that require *no* repetitive, forceful gripping or operation of vibrating tools with her non-dominant hand." The ALJ also referred to Ms. Feldt's medical records concerning her non-dominant hand in concluding that "the objective medical evidence does not demonstrate a restriction in her ability to use her hands of such degree that would

prevent her from performing work at the limited range of light work." (Tr. 21).

Furthermore, the ALJ considered the fact that Ms. Feldt was able to take care of her personal needs and her children without assistance, she cooked, did laundry and household chores, went shopping without assistance, and read, watched television, and listened to music. The ALJ also noted (in considering Ms. Feldt's degenerative disc disease of the lumbar spine) that the record was devoid of "ineffective ambulation or fine and gross movement." (Tr. 15). In other words, Ms. Feldt was capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering; and therefore, she could carry out activities of daily living, such as, preparing a simple meal, feeding herself and taking care of her personal hygiene, sort papers, and place files in a cabinet at or above the waistline.

Therefore, while the record indicates lack of sensation and grip in her right, non-dominant hand, the ALJ took this into consideration when he found that Ms. Feldt was able to only perform light work with several restrictions accounting for the non-dominant hand impairments. *See*, *Cross v. Astrue*, 2008 WL 596005 *9 (S.D. Ind. Feb. 29, 2008) (the ALJ properly articulated her reasons for finding that the claimant was unable to use his non-dominant hand, yet was capable of performing medium exertional work).

Thus, the Court finds that the ALJ's determination of Ms. Feldt's RFC, in light of her right, non-dominant hand limitations, is supported by substantial evidence.

### 2) RFC and Mental Limitations on Daily Activities

Ms. Feldt contests the ALJ's determination that she has no limitations in activities of daily living, because the finding does not account for her mental impairments. In other words, Ms. Feldt argues that the ALJ improperly concluded that her mental impairments did not restrict her activities

of daily living because the ALJ did not determine how effectively Ms. Feldt was able to complete these activities.[5]

In assessing Ms. Feldt's mental abilities, the ALJ must:

> . . .first assess the nature and extent of [the claimant's] mental limitations and restrictions and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [the claimant's] ability to do past work and other work.

20 C.F.R. § 404.1545(c).

The ALJ analyzed Ms. Feldt's mental impairments under the criteria of listings in 12.04 and 12.06. To meet or equal a listed impairment, a claimant must satisfy all of the criteria set forth in the listing, and solely the claimant has the burden of proving that her condition meets or equals a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The ALJ found that Ms. Feldt had no limitations in her activities of daily living, no difficulty in social functioning, moderate difficulties with concentration, persistence and pace, and no episodes of decompensation. The ALJ found that because Ms. Feldt's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, she did not medically equal the necessary criteria in 12.04 and 12.06. *See*, 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.00 (defining a "marked" impairment as "more than

---

[5]     The Commissioner argues that Ms. Feldt has waived any issue with regard to the ALJ's determination of her mental impairments. This Court does not agree. Ms. Feldt's argument in disputing the ALJ's determination of her activities of daily living, while lacking in clarity, does indirectly raise issue with the ALJ's overall determination of her mental status and the effect on the RFC assessment. As such, the Court will consider whether the ALJ's determination of Ms. Feldt's RFC is supported by substantial evidence.

moderate but less than extreme," such as "when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.").

In making these findings, and in assessing her RFC, the ALJ considered Ms. Feldt's activities of daily living; her social functioning; her concentration, persistence and pace; and episodes of decompensation. Specifically, the ALJ pointed to the following evidence in support of his conclusions: (1) Ms. Feldt has two daughters, ages 7 and 10, who she cares for; (2) Ms. Feldt cooks, does laundry and household chores, takes care of her personal needs the needs of her daughters, and enjoys music, watching televison, and reading; (3) Ms. Feldt's mother attested that Ms. Feldt cares for her daughters and goes shopping without assistance, cooks, does laundry and completes household tasks; (4) Ms. Feldt's ability to spend time with others playing cards, going to movies, dining out at restaurants, and ability to get along well with friends, store clerks, and waiters; (5) Ms. Feldt's low tolerance to frustration with co-workers, supervisors, and others; (6) Ms. Feldt's tendency to become easily distracted and lose concentration, yet ability to play games, enjoy movies, and go grocery shopping without assistance; (7) Ms. Feldt's assigned GAF scores of 58-60; (8) Ms. Feldt's hospitalization from February 24-26, 2005, for suicide precaution, yet no record of episodes of decompensation for an extended duration, and no evidence establishing that a minimal increase in mental demands or change in environment would cause the claimant to decompensate, and no evidence that Ms. Feldt is unable to function outside a highly supportive living arrangement; (9) Ms. Feldt's fifth grade verbal IQ score of 94, Performance IQ score of 86, and Full Scale IQ score of 89, and (10) Ms. Feldt's ability to do simple addition and subtraction. The ALJ also explicitly considered: (1) the September 2, 2004 consultative mental status examination, which resulted in a

diagnosis of panic disorder without agoraphobia, major depression (recurrent, moderate), learning disability NOS, and a mathematics disorder; and, (2) the June 13, 2005 psychiatric evaluation, which resulted in the diagnosis of major depression disorder (recurrent episodes without psychotic behavior), posttraumatic stress disorder, generalized anxiety disorder, and possible attention deficit disorder.

Yet, Ms. Feldt argues that the ALJ failed to consider her mother's opinion that Ms. Feldt could not maintain a daily routine, and the social worker's statement that Ms. Feldt had moderate difficulty in activities of daily living. This Court disagrees.

First, the ALJ is not required to address every piece of evidence or testimony in the record as long as he provides some glimpse into the reasoning behind the decision, which he did here. *See Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). Second, the ALJ *did* consider the mother's testimony provided in June of 2004. Although the mother stated that Ms. Feldt could not maintain a daily routine, she also stated that Ms. Feldt was able to care for herself and her daughters without assistance, go shopping without assistance, and cook, do laundry, and complete household tasks, which the ALJ considered. (Tr. 16, 83-91). Moreover, the inability for Ms. Feldt to consistently do similar activities day in and day out (i.e. "maintain a daily routine"), does not mean that Ms. Feldt was unable to perform activities of daily living, or experienced difficulty performing them. Lastly, while there was some evidence that in October and November 2004, Ms. Feldt may have had "mild" restriction of daily activities, the ALJ noted that in November 2005, medical records reported that Ms. Feldt was currently "physically active" but did not work.

Aside, the ALJ noted Ms. Feldt's inability to maintain routines, and acknowledged that she becomes easily distracted, easily loses concentration, and has never completed her GED (even after 10 years). Based on this, the ALJ determined that Ms. Feldt had moderate difficulty in

23

concentration, persistence and pace. The ALJ stated: "Based on [Ms. Feldt's] testimony and the evidence of record, I have limited her to working with simple, repetitive tasks, no mathematics beyond simple addition and subtraction, and no more than superficial interaction with the general public, co-workers, or supervisors . . . limitations [which] more than adequately account for the claimant's mental impairment to the extent demonstrated by evidence of record." (Tr. 22).

As a result, the Court finds that the ALJ followed the proper framework in determining that Ms. Feldt's mental impairments resulted in no limitations in her activities of daily living, no difficulty in social functioning, moderate difficulties with concentration, persistence and pace, and no episodes of decompensation. Further, while reasonable minds may differ as to the result, the ALJ built a logical bridge between the evidence he examined and the conclusions he reached based on that evidence, in finding that Ms. Feldt was capable of performing light work with several restrictions accounting for her non-dominant hand impairment, and moderate difficulty with concentration, persistence, pace, and learning. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). As such, since the ALJ's RFC finding is supported by the substantial evidence in the record, the determination will not be disturbed.

## IV.  CONCLUSION

The purpose of this Court's review of the ALJ's decision is to ensure that it is supported by substantial evidence. Therefore, given that the ALJ's decision is supported by substantial evidence, the decision of the Commissioner is **AFFIRMED.**

**SO ORDERED.**

**DATED: May 15, 2009.**

_____/s/ ALLEN SHARP_____
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**
